IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

GREG L. WINFORD                                                    PLAINTIFF

            v.                    Civil No. 2:12CV2227-JRM

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                               DEFENDANT

MEMORANDUM OPINION

Plaintiff, Greg. L. Winford, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying his claim for a period of disability, disability insurance benefits ("DIB"), and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act

(hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the

court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

I.        **Procedural Background:**

Plaintiff originally applied for SSI and DIB on January 9, 2004, alleging an onset date

of September 1, 2001. (Tr. 57-58.)  The disability claim was based on injuries to his left arm and

both ankles sustained in a 1993 motor vehicle accident. (Tr. 58-59.) Plaintiff's applications were

denied initially and on reconsideration. Plaintiff requested an administrative hearing, which was

held before ALJ Puett on  June 1, 2005. (Tr. 57.) Plaintiff was present to testify and was

represented by counsel.  The ALJ also heard testimony from Vocational Expert ("VE") David

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

O'Neal. (Tr. 57.) ALJ Puett issued an unfavorable decision on July 26, 2005. (Tr. 66.) Plaintiff appealed to this Court and the decision was affirmed on September 29, 2006. (Tr. 73.)

Plaintiff filed an application for DIB on September 18, 2007, alleging injuries to his left arm, both ankles, and back. (Tr. 135, 139.) The onset date was alleged as July 27, 2007 due to the prior unfavorable decision. (Tr. 134.) A hearing was held on October 29, 2008 before ALJ LaPolt. (Tr. 81.) Plaintiff was present to testify and was represented by counsel. (Tr. 73.) ALJ LaPolt noted that Plaintiff's date last insured was December 31, 2006, and he therefore needed to establish disability on or before that date. (Tr. 73.)  The ALJ also heard testimony from VE David O'Neal. (Tr. 73.) ALJ LaPolt issued an unfavorable decision on January 21, 2010. (Tr. 81.) Plaintiff appealed to this Court, and on August 29th, 2011,  the decision was remanded with direction to recontact Dr. Myers to ascertain the dates of his evaluation and assessment of the Plaintiff. (Tr. 473.)

Plaintiff filed for SSI on January 17, 2011. (Tr. 403.) In his August 3, 2012 decision, ALJ Neel noted that the SSI claim had been escalated to the hearing level, and therefore his decision addressed both the SSI and the DIB claims. The hearing for this decision took place on January 25, 2012. Plaintiff was present to testify and was represented by counsel. Counsel noted for the record that the SSI claim was submitted to the Agency at the same time as the DIB claim. However, the Agency had no record of it. Therefore the Plaintiff had re-filed the SSI claim. (Tr. 423-24.) The ALJ also heard testimony from VE Sarah Moore. (Tr. 403.)

At the time of the third administrative hearing, Plaintiff was 47 years old, and possessed a GED and a certification in Heating and Air from Arkansas Valley Vo-Tech . (Tr. 426-27.) The

2

Plaintiff had past relevant work experience ("PRW") of meter reader, backhoe operator, truck mechanic, trash collector, and heavy equipment operator. (Tr. 412, 456.)

On August 3, 2102, the ALJ concluded that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine, status-post motor vehicle accident; arthritic changes in his right hip; left forearm fractures, status-postoperative; scoliosis; fracture of the left lower extremity, status-post open reduction internal fixation (ORIF); hypertension; and supraventricular tachycardia." (Tr. 406.) The ALJ found that Plaintiff maintained the residual functional capacity to perform sedentary work, but was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. He also limited the Plaintiff to "frequent but not constant handling with his left upper extremity and only occasional operation of foot controls with his left lower extremity." (Tr. 406.) With the assistance of the VE, the ALJ determined that the Plaintiff could perform such representative occupations as machine tender and assembler. (Tr. 413.)

## II.    Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome,

3

or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)©. A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and

4

work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.   Discussion:

Plaintiff raises five issues on appeal: 1) the ALJ erred when he failed to recontact Dr. Honghiran; 2) the ALJ erred in rejecting the opinion of Dr. Hongrihan; 3) the ALJ erred when he rejected the opinion of Dr. Myers; 4) the ALJ erred in his overall RFC assessment; and 5) the ALJ erred in his credibility assessment of Plaintiff. (Pl.'s Br. 5.) Because issue 1 and issue 4 are based on the same factual points concerning Dr. Honghiran, they will be addressed together.

## A.   Rejecting Opinion of Dr. Myers

The Plaintiff argues that the ALJ erred by rejecting the opinion of Dr. Myers, a consultative examiner, as being inconsistent with the other objective medical evidence. (Pl.'s Br. 19.) Plaintiff asserts that the ALJ did not indicate what the inconsistencies were, and that the opinions of Dr. Bennett (2005), Dr. Myers (2008), and Dr. Hongrihan (2008 and 2012) were all consistent. (Pl.'s Br. 20.)

Because this claim has a long history, a chronological review of the medical examination records and physical RFC's in the transcript are summarized here for reference. Plaintiff's date last insured is December 31, 2006. (Tr. 403.)

- **February 1980: St. Edward Mercy Emergency Room:**  Motor vehicle accident. Fracture of zygomatic arch, right; lacerations and abrasions, widening of the SI joint on the right, fracture of right acetabulum with associated sire of neuropathy secondary to trauma. (Tr. 358.) X-ray of lumbar region showed slight scoliosis of the lumbar region with convexity to the left. (Tr. 375.)

- **April 1985: Bailey Clinic:** Plaintiff presented with lumbar strain from lifting heavy items at work. (Tr. 265.) X-ray of Lumbar region showed scoliotic changes in the mid-lumbar region, convex to the left. No encroachment to the neural canal. Spina bifida occulta at S-1. (Tr. 264.)

- **December 1993: St. Edward Mercy Emergency Room:** Motor vehicle accident. Final diagnosis included open fracture of left femur, grade II; both bone forearm fracture of left arm; soft tissue injury to right leg; tachycardia (resolved); post-traumatic pericarditis, and maxillary sinus fracture - left. (Tr. 300.) An x-ray of the cervical spine showed straightening of the normal cervical lordosis. (Tr. 332.)

- **January 1998: St. Edward Mercy Emergency Room:** Plaintiff presented with pain in the left side of chest. X-rays of chest noted "mild degenerative changes of the thoracic spine." No active cardiac or pulmonary disease noted. (Tr. 296.)

- **January 1999: St. Edward Mercy Medical Center:** X-ray of facial bones showed post-surgical changes to facial bones.

- **August 2000: St. Edward Mercy Emergency Room:** Plaintiff was taken to emergency room after he threatened suicide with a knife. He was acutely intoxicated (BAC 0.281) and positive for marijuana. (Tr. 271-72.) He was admitted with a psychiatric consultation. (Tr. 272.) He was discharged with a prescription for Zoloft for depression and a refill of his Verapamil[2] for tachycardia. (Tr. 281.)

---

[2]Verapamil is a calcium channel blocker indicated for several conditions, including prevention of supraventricular tachycardia. http://www.pdr.net/drug-summary/calan?druglabelid=1693&id=1378 (last accessed Jan. 7, 2014).

- **November 2002: Dr. Emad Al-Ghussain:** Plaintiff ran out of his Verapamil and began having heart palpitations. Dr. Al-Ghussain refilled his prescription of Verapamil. (Tr. 381.)

- **November 2005:St. Edward Mercy Emergency Room:** Plaintiff presented with heart palpitations. Heart was mildly tachycardic. Discharge condition good. (Tr. 196.)

- **December 2005: Dr. Bennett:** Plaintiff presented to Dr. Bennett complaining of lower back pain, with pain radiating into the lower left leg. He also complained of numbness and tingling in the left leg. (Tr. 219.) Bennett examined Plaintiff on December 16 and December 30, 2005. Ordered an MRI. The MRI on December 23rd showed "overall disk protrusion at LS-SI, greater toward the left side with possible nerve root compression as described. He has degenerative disk changes at LS-SI." Dr. Bennett's assessment was "Herniated Disk of Lumbar Spine with Low Back and Left Lower Extremity Pain" and "Degenerative Disk Disease of the Spine." (Tr. 218.)

- **June 2006: St. Edward Mercy Emergency Room:** Plaintiff brought in after a motor vehicle accident with a pneumothorax. He was admitted and observed for four days, and discharged in stable condition. (Tr. 198.) A series of CT scans was performed. A scan of the cervical spine indicated a suspected small central disc protrusion at C5-6 and no acute traumatic abnormality. (Tr. 203.) There is no lumbar scan included for this date.[3]  An X-ray of the right hip displayed arthritic changes to the left proximal femur. (Tr. 213.)

- October 2007: Dr. Redd: Physical RFC Assessment (Non-Examining): Primary diagnosis of lumbar osteoarthritis. Found that Plaintiff should be able to lift 20 lbs occasionally and

---

[3]However, the 2005 MRI lumbar record is included here in the transcript.

AO72A
(Rev. 8/82)

ten pounds frequently. Plaintiff should be able to stand/walk and sit about 6 hours in an 8-hour workday. No other limitations noted.(Tr. 222-29.)

- **October and December 2007: Good Samaritan Clinic:** Plaintiff presented at the clinic with back and hip pain. (Tr. 230-37.) An X-ray of the lumbar spine showed "Mild scoliosis, lumbar spine, convexity to the left. Five lumbar vertebrae. Moderate degenerative spurring L5-Sl. Mild degenerative change, lower T-spine." (Tr. 393.) He was seen on October 5, November 11, and November 26. As discussed in detail in the credibility section of this opinion, the physicians prescribed several drugs for Plaintiff to try for his back pain. (Tr. 230-33.)  Plaintiff reported that the drugs were not helpful and did not return to the clinic after the third visit. (Tr. 454.)

- **October 2008: Medical Source Statement (Physical RFC) from Dr. Myers:** In completing the assessment, Dr. Myer's referenced the following medical records: "MRI-Lumbar Spine; Orthopedic Clinic and Sports Medicine; Range of Motion Chart completed by Dr. Ted Honghiran; medical note from Dr. Michael Wolfe; and Discharge Summary of Dr. David Hunton." (Tr. 383.)  "He indicated that Plaintiff was diagnosed with chronic lower back pain secondary to a herniated disk at the L5-S I level with nerve root compression on the left, degenerative joint disease of the lumbar spine, and status post fixation of a left femur fracture with chronic pain. Dr. Myers noted muscle weakness and atrophy in the left lower extremity, an antalgic gait favoring the right side, a decreased range of motion in the left hip, an inability to walk on heel/toes, a weak ability to oppose thumb to fingers, and a 50% diminished grip strength with the left hand.

8

He then completed an RFC assessment indicating that Plaintiff could sit for 15 minutes at a time for a total of four hours per day, stand for 5 minutes for a total of three hours, and walk for 30 minutes for a total of one hour. Dr. Myers also determined Plaintiff could occasionally lift and/or carry up to ten pounds; frequently reach above his head, work near dust, fumes, and gases, and be exposed to noise, occasionally work near marked temperature changes and drive automotive equipment; and, never bend, squat, crawl, climb, stoop, crouch, crawl, be exposed to unprotected heights, or work near moving machinery. He also concluded that Plaintiff's severe pain would cause him to miss more than four days of work per month and require him to elevate his feet periodically." (Tr. 472.)(cites to prior transcript pages omitted.)

- **January 2008: Disability Assessment Consulting Examination with Dr. Honghiran of Orthopaedic Clinic and Sports Medicine:** Dr. Honghiran is an orthopedic specialist. He referenced the 2005 MRI. (Tr. 238.) The examination showed the Plaintiff walked with a limp on his left leg. He was not able to walk on tiptoes and heels. He was able to dress and undress himself. The range of motion of the lumbar spine was restricted. He could only flex 60 degrees and bends side to side 25 degrees with pain. (Tr. 238.) "The straight leg raises causes pain in his left leg and lower back at about 60 degrees on the left side. The reflex and sensation in both knees and ankles are active and equal on both sides. Sensation is intact except for tingling feelings of the left foot." (Tr 239.) X-rays of the right ankle, left hip, and left knee were taken. They showed that the right ankle was normal. The right hip showed "the fracture of the left hip has completely healed and the hip joint is in good position with no signs of arthritis present." (Tr. 239.) The left knee

9

showed "the intramedullary nail is still in place in the femur and the screws are still in place. The knee joint appears to be normal, with good joint spaces well maintained." (Tr. 239.) Dr. Honghiran felt that Plaintiff's pain was "due to the herniated disc in the lower lumbar spine because of the nerve root irritation on the left side causes pain in his left hip and leg." (Tr. 239.) He felt that the Plaintiff should see a neurosurgeon to see if surgery would help. He stated "[a]t this time he has difficulty working a construction job and running the tractors or backhoe which is understandable." (Tr. 239.)

- **January 2008: Physical RFC by Dr. Davidson (non-examining assessment):** Dr. Davidson referenced the 2005 MRI from Dr. Bennett, the records from Good Samaritan Clinic, and Dr. Honghiran's 2008 examination. (Tr. 250.) The primary diagnosis assigned was degenerative disc disease, the secondary diagnosis multiple injuries. (Tr. 243.) Dr. Davidson found that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, could stand and/or walk at least two hours in an eight-hour work day, sit about 6 hours in an eight-hour workday, and had unlimited push/pull. (Tr. 244.) All postural limitations were assessed as occasionally. (Tr. 245.)

- **September 2011: St. Edward Mercy Medical:** Plaintiff presented with a right hand injured the day before by a lawn mower. (Tr. 570.) Exam showed "slight amount of edema" over the right dorsal aspect of the hand. (Tr. 571.) He was prescribed hydrocodone and was discharged stating that he was "feeling better." (Tr. 572.)

- **January 2012: Letter from Dr. Myers Post-Remand:** One remand on August 24, 2011, this Court directed the ALJ to "recontact Dr. Myers to inquire as to the dates covered by his evaluation and assessment of Plaintiff." (Tr. 473.) In response, Dr. Myers

10

responded with a single sentence letter stating: "After reviewing our records on Mr. Winford, it is my medical opinion, I doubt that any significant changes in this gentleman's conditions would have taken place between 2005-2008 at the time of my examination of him." (Tr. 579.)

- **April 2012: Disability Assessment Consulting Examination with Dr. Honghiran :** Plaintiff brought the copy of his 2005 MRI with him to the exam. (Tr. 580.) Dr. Hongrihan stated this showed evidence of a ruptured disc at L5-S1 and degenerative disc disease in the lower lumbar spine. (Tr. 580.) Physical examination showed that he walked with a limp in his left leg. He was able to dress and undress himself without difficulty. He could not get on tiptoes or heels or squat down. He could get on and off the table without difficulty. He had no acute muscle spasms. (Tr. 581.)

X-rays of the thoracic spine, lumbar spine, forearm, and left knee were taken. The thoracic spine was normal. The lumbar spine showed "evidence of degenerative disc disease at the L5-S1 level, moderately severe." (Tr. 581.) The left forearm showed "evidence of fracture of the left forearm; with plate and screws in place, which is completely healed, in good alignment." (Tr. 581.)  The left knee showed "evidence of a fracture of the distal femur that has been fixed, with an intramedullary nail, which is completely healed, with no signs of severe arthritis." (Tr. 581.) Dr. Honghiran stated that "[i]t is my impression that this gentleman has a history of having chronic low back pain and left leg pain from herniated disc problems." (Tr. 581.) He repeated the statement from his 2008 examination that he thought the Plaintiff needed to see a specialist to get

11

treatment.  He then said "[a]t this time I do not think he is able to return to work of any capacity." (Tr. 581.) This statement is discussed in detail below.

The ALJ gave Dr. Myer's 2008 opinion some weight "to the extent it is consistent with the other objective medical evidence of record as a whole." However, he found that much of his assessment was not consistent with the rest of the record. He also found that the 2012 statement from Dr. Myers was "purely speculative" and made it clear that Dr. Myers was not a treating physician. (Tr. 412.) He also noted that the 2008 examination was almost two years after Plaintiff's date last insured. (Tr. 412.) He noted that his findings were significantly different than those of Dr. Bennett and different from those of Dr. Honghiran. Finally, he noted that Dr. Myers in not an orthopedic specialist. (Tr. 412.)

It is well-settled that evidence of a disability subsequent to the expiration of one's insured status can be relevant in "helping to elucidate a medical condition during the time for which benefits might be rewarded." *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998). In the case of degenerative diseases which, inherently by their nature must begin prior to an onset date of disability,  "[r]etrospective medical diagnoses constitute relevant evidence of pre-expiration disability." *Jones v. Chater*, 65 F. 3d 102, 103 (8th Cir. 1995) (citing *McClain v. Bowen*, 848 F.2d 892, 894 (8th Cir. 1988). In this case the Plaintiff has been consistently diagnosed with degenerative disc disease. Therefore, the fact that Dr Myer's 2008 opinion was after the Plaintiff's date last insured of December 31, 2006, does not automatically disqualify it from being relevant. As was pointed out in this Court's remand opinion in 2011, Dr. Myers specifically referenced Dr. Bennett's 2005 MRI in forming his opinion. That 2005 MRI was well within the Plaintiff's insured period. (Tr. 473.)

However, the ALJ correctly noted that Dr. Meyer's 2008 opinion differed significantly from those of Dr. Bennett and Dr. Honghiran. (Tr. 412.) While Dr. Meyer's opinion was consistent with the rest of the medical record  in terms of the underlying diagnosis of lower back problems, his opinion differed significantly from that of Dr. Bennett, Dr. Honghiran, and the Good Samaritan physicians on several points.

First, Dr. Meyers reported that the Plaintiff had problems with a different leg than any other physician. Dr. Meyers noted that the Plaintiff favored his right leg. (Tr. 384.) Dr. Honghiran, the orthopedic specialist who examined the Plaintiff twice, stated that the Plaintiff limped on his left leg. (Tr. 238, 581.) Dr. Bennett noted that the Plaintiff complained of pain in the left leg. (Tr. 219.) The Good Samaritan physicians reported that he complained of pain down the left leg. (Tr. 390, 392.)

Second, Dr. Myers noted symptoms not present anywhere else in the record. He noted a weak ability to oppose thumb to fingers, and a 50% diminished grip in the left hand. He also noted weak abduction and flexion of the arms at the shoulders. (Tr. 384.) Plaintiff testified in his 2011 hearing that the issues with the left hand were the results of broken bones from his car accident in 1993. (Tr. 489.) However, he saw Dr. Bennett in 1995, Dr. Hongrihan in 2008 and 2012, and the Good Samaritan physicians in 2007. In contrast to Dr. Myers, Dr. Bennett, Dr. Hongrihan, and the Good Samaritan physicians did not note any loss of hand grip or hand mobility. Nor did the Plaintiff complain to any of these physicians of problems with his left hand. In his 2012 hearing, Plaintiff testified that he did not have any hand grip problems, it was more an issue of left arm strength. (Tr. 449.) As an orthopedic specialist, Dr. Hongrihan's assessment of the left forearm x-ray in his 2011 exam was that it was "completely healed, in

13

good alignment." (Tr. 581.) He did not note any upper extremity abnormalities on the range of motion chart in either 2008 or 2011. (Tr. 240, 582.)

Third, Dr. Myers assessed a range of motion in the lumbar spine that was significantly different than that of Dr. Honghiran. Dr. Myers indicated that the flexion-extension for the lumbar spine was 48 degrees and lateral flexion was 5 degrees. (Tr. 385.) In both of his exams, Dr. Honghiran indicated that the flexion-extension was 60 degrees and the lateral flexion was 25 degrees.(Tr. 240, 582.)

Finally, Dr. Meyer's 2012 post-remand letter made it clear that he was a one-time consultative physician, not a treating physician. This was expressly noted by the ALJ. (Tr. 412.) Plaintiff's attorney also agreed that Dr. Myer was not a treating physician in the 2012 hearing. (Tr. 422.)

In summary, Dr. Myers was a one-time consultative examiner and some of his opinion was inconsistent with the other objective medical records in the transcript, including that of the orthopedic specialist who examined Plaintiff twice. Therefore the ALJ did not err in assigning Dr. Myers opinion "some weight only to the extent is consistent with the above residual functioning capacity." *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (opinion of specialist should be given more weight in their area of speciality and the opinion of a consulting physician who examines claimant once does not generally constitute substantial evidence.)

**B.     Rejecting Dr. Hongrihan's Statement that Plaintiff Was Unable to Return to Work of Any Capacity**

Plaintiff argues that Dr. Hongrihan's statement that "at this time I do not think [Plaintiff] is able to return to work of any capacity" should not have been rejected by the ALJ. (Pl.'s Br. 11, Tr. 581.) The ALJ properly discounted this statement.

14

"Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing  20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). Therefore, the ALJ is entitled to discount medical source opinions which merely make conclusory statements that a claimant "is disabled" or "unable to work." *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (citing *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005.)

In this case, the ALJ gave Dr. Hongrihan's statement  because it was "not consistent with the other evidence of record," including the Plaintiff's testimony that he had run a brush hog (mower deck on a tractor) for the City of Huntington for about a month. (Tr. 411.) Given that Dr. Honghiran's physical assessment in 2008 and 2012 were identical, it was also inconsistent with Plaintiff's 2012 testimony that his condition had not changed significantly since his 2005 MRI. (Tr. 450.) However, even without this inconsistency, the ALJ was free to discount the conclusory statement because it was a medical source opinion stating that the claimant was unable to return to work, and, as such, invaded the ALJ's province in determining the Plaintiff's overall RFC.

C.     **Recontacting Dr. Hongrihan for a Function Report And Assessment of Overall RFC**

Plaintiff argues that the ALJ failed to fully develop the record when he failed to recontact Dr. Honghiran for a function by function assessment to clarify his statement that he was unable to return to work. (Pl.'s Br. 12.) Plaintiff also argues that without a function report from an examining or treating physician, the ALJ did not fully develop the record in assessing Plaintiff's overall RFC. (Pl.'s Br. 10.)

The Eighth Circuit has stated that a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). The record should "include some

medical evidence that supports the ALJ's residual functional capacity finding." *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.' " *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir.2001) (quoting *Frankl v. Shalala*, 47 F.3d 935, 937–38 (8th Cir.1995)) (alterations in original); *see also Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001)(ALJ not required to order another consultative exam when there were numerous medical reports from treating and consulting physicians over a six year period, two hearings where claimant was represented by counsel, and numerous disability reports, outlines and questionnaires in the transcript). Remand for failure to develop the record is appropriate only when such failure is unfair or prejudicial and would therefore make a difference in the final result of the case. *Onstad v. Shalala*, 999 F.2d 1232 (8th Cir. 1993.)

In this case, Plaintiff has been represented by counsel for the entire duration of the current claims and there is no indication that he has been treated unfairly by the Agency. There was sufficient basis in the record to allow the ALJ to make an informed decision, and it does not appear that re-contacting Dr. Honghiran would produce a different result.

The Plaintiff's medical records in the transcript span from 1980 to 2012. As listed and discussed above in subsection A, the findings of Dr. Bennett, Dr. Honghiran, the Good Samaritan physicians, Dr. Myers, and Dr. Davidson were all consistent in diagnosing Plaintiff with degenerative disc disease in the lumbar region, and in noting Plaintiff's injuries from his multiple car accidents. There are also multiple disability reports in the transcript.

16

Plaintiff has had three administrative hearings since he first filed his claims in 2004. He was represented by counsel at all three hearings. (Tr. 19, 57, 419.) Plaintiff is correct that it would have been preferable if treating physician had completed a function assessment for him. However, due to the sporadic nature of his treatment history, he does not have a treating physician because he has never seen any physician more than a few times for any reason. Plaintiff himself admitted that he has no treating physician. (Pl.'s Br. 19.)

The Agency referred Plaintiff to Dr. Honghiran, an orthopedic specialist, twice for consultative exams.  Dr. Honghiran examined Plaintiff in 2008 and 2012. In both cases he diagnosed him with a herniated disc in the lower back. (Tr. 239, 581.) In both examinations he identified 60 degrees of flexion and 25 degrees of lateral flexion for both sides in the lumbar region. (Tr. 240, 582.)   In 2008 he stated that "it was understandable" that Plaintiff was experiencing difficulty working a construction job.(Tr. 239.) In 2012 he stated that he did not think the Plaintiff could return to work of any capacity. (Tr. 581.) Dr. Honghiran did not indicate why he made different summative statements for the same physical diagnoses. Plaintiff testified in 2012 that his condition had not changed significantly since the 2005 MRI. (Tr. 450.) As discussed above, the ALJ properly discounted Dr. Honghiran's conclusory statement.

Although Dr. Honghiran did not complete a function assessment for the Plaintiff, there are three function reports in the transcript,[4] one from Dr. Davidson (non-examining Physical RFC Assessment 2008), one from Dr. Redd  (non-examining Physical RFC Assessment 2007),

---

[4]There is reference to a 2004 function report by CE McCraw in the decision of ALJ Puett, but that report was not included in this transcript. According to ALJ Puett, that function report indicated mild to moderate limitations for Plaintiff's ability walk, stand, sit, lift, carry, handle, finger, see, hear, or speak. (Tr. 60.)

and one from Dr. Myers (one-time examiner 2008). A direct comparison of these findings is listed below for ease of reference:

|  | Dr. Redd | Dr. Davidson | Dr. Myers |
|---|---|---|---|
| Occasionally lift and carry | 20 lbs | 10 lbs | 1-20 lbs |
| Frequently lift and carry | 10 lbs | less than 10 lbs | Not capable of lifting any weight frequently |
| Stand and/or walk in an 8-hour workday. | 6 hours | 2 hours | 3 hours standing, 1 hour walking |
| Sit, with normal breaks in 8-hour workday | 6 hours | 6 hours | 4 hours |
| Push/pull (including hand or foot controls) | Unlimited | Unlimited | Can't use either foot Hands "yes" |
| Postural limitations such as climbing, stooping, etc. | None | Occasionally | Never |
| Manipulative limitations such as fine and gross manipulation, etc. | None | None | No fine manipulation with left hand |
| Visual limitations | None | None | None |
| Communicative limitations | None | None | None |

18

| Environmental limitations such as heat, cold, fumes, etc. | None | None | Frequently tolerate: noise, dust, fumes, and gases Occasionally tolerate driving and marked temperature changes Never tolerate unprotected heights or being around moving machinery. |
| --- | --- | --- | --- |

Dr. Davidson expressly referred to the 2005 MRI from Dr. Bennett, Dr. Hongrihan's examination records, and the Good Samaritan examination records in making her function report. (Tr. 250.) Dr. Redd expressly referred to the 2005 MRI from Dr. Bennett, Dr. Bennett's examination records, and the various ER records in Plaintiff's files.

Despite discounting a portion of Dr. Myer's analysis for being inconsistent with the rest of the medical record, the ALJ obviously considered his findings in his overall RFC in that he assigned limitations for the left upper and lower extremities. (Tr. 406.) These limitation were only present in Dr. Myer's function assessment, not Dr. Davidson's or Dr. Redd's.

The ALJ gave the Plaintiff considerable benefit of the doubt in assessing the overall RFC, assigning a sedentary work level with additional limitations. This despite the fact that some of the limitations addressed issues diagnosed only by Dr. Myers and despite the fact that he found the Plaintiff's subjective allegations of pain to be less than credible. *See. e.g. Ellis v. Barnhart*, 392 F.3d 988, 993 (despite Plaintiff's lack of credibility, ALJ gave claimant benefit of the doubt in assessing RFC of sedentary work).

AO72A
(Rev. 8/82)

In summary, there was sufficient basis in the record to allow the ALJ to make an informed decision, and there is no indication that the Agency has treated Plaintiff unfairly. To the contrary,  Plaintiff has participated in multiple administrative hearings while represented by his attorney, has had two consultative exams from an orthopedic specialist which produced identical physical diagnoses, has a number of disability reports and worksheets in his transcript, has had several RFC assessments, and has included medical records from a number of physicians spanning from 1980 to 2012. All of the objective medical evidence has been consistent in showing the same evidence of problems with Plaintiff's lower back and injuries from multiple car accidents. To the extent that there have been some differences of medical opinion as to how those issues affect his ability to work, it is the function of the ALJ to resolve those differences based on the record as whole. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians.")(citing *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

**D.     Credibility Assessment**

Plaintiff argues that the ALJ improperly discredited Plaintiff's subjective complaints solely due to Plaintiff's failure to seek treatment, rather than fully discussing the *Polaski* factors. (Pl.'s Br. 18.)

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.' " *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir.2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2002)). The ALJ must consider several factors when evaluating a claimant's subjective complaints of pain, including claimant's prior work record, observations by third parties, and observations of treating and examining physicians relating to 1) the claimant's daily

20

activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Casey*, 503 F.3d 687, 695 (8th Cir.2007) (citing *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir.1984). In discrediting a claimant's subjective complaints, an ALJ is required to consider all available evidence on the record as a whole and is required to make an express credibility determination. *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000). However, the ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004)

"The ALJ may properly consider both the claimant's willingness to submit to treatment and the type of medication prescribed in order to determine the sincerity of the claimant's allegations of pain." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991) (citations omitted). Failure to seek regular medical treatment "seriously undermines" a claimant's credibility. *Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003)("if her pain was as severe as she alleges, [claimant] would have sought regular medical treatment.") Financial hardship may be taken into consideration by the ALJ when evaluating a failure to seek regular treatment. *Tome v. Schweiker*, 724 F.2d 711 (th Cir. 1984.)  However, financial hardship does not excuse a claimant's failure to seek regular treatment unless there is evidence that the claimant was denied treatment for financial reasons or was unable to pursue low-cost treatment options. *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir.1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty). Absent some valid financial or other consideration, "[a]n ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to

pursue regular medical treatment." *Edwards*, 314 F.3d at 967 (citing *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir.1996)).

A claimant's allegations of disabling pain may also be discredited "by evidence that the claimant has received minimum medical treatment and/or has taken medications for pain only on an occasional basis." *Williams v. Bowen*, 790 F.2d 713 (8th Cir.1986). (citing *Cline v. Sullivan*, 939 F.2d 560, 568 (8th Cir. 1991)). The use of moderate, over-the-counter pain medication does not support an allegation of disabling pain. *See Hepp. v. Astrue*, 511 F.3d 798, 807. (8th Cir. 2008).

In this case, there is no evidence that the Plaintiff was ever denied care due to poverty. There is, however, substantial evidence, including the Plaintiff's own testimony, that he did not seek regular care and that he was not taking prescription pain medication.

The ALJ expressly noted both the Plaintiff's absence of regular treatment and his failure to use prescription pain medication to discredit Plaintiff's allegations of severe and disabling symptoms. (Tr. 412.) The ALJ noted two large gaps in treatment, one for approximately twenty-two months and one for approximately thirty-five months. Specifically, the ALJ noted "[t]here are no medical records in the claimant's file indicating treatment or ER visits for exacerbation of symptoms from December 2005 until he was seen at the Good Samaritan Clinic in October 2007." (Tr. 409.) (Although he did present at the ER in June 2006 for another motor vehicle accident. He presented at Good Samaritan 16 months after that accident. (Tr. 412.)) He also noted the lack of medical records from October 2008 to September 2011. The 2011 treatment was for a lawn mower injury to his hand. (Tr. 410.) He also noted that Dr. Hongrihan recommended that the Plaintiff see a neurosurgeon for his herniated disc, but that the Plaintiff

22

did not do so due to a lack of insurance. (Tr. 411.)  The ALJ also noted that there was "no evidence that the claimant has consistently taken prescribed medications since his alleged onset date." (Tr. 412.)

Plaintiff did not provide evidence or testimony that any physician turned him away for poverty. Further, Plaintiff's testimony indicates that he failed to continue pursuing treatment at a  low-cost clinic because it was inconvenient and he was dissatisfied with the results after two months, not because he was denied treatment for poverty. Additionally, his testimony concerning the low-cost clinic's unwillingness to prescribe pain medication is directly contradicted by the clinic's objective medical records.  He testified that he tried going to the Good Samaritan clinic after he saw an ad for them on television. (Tr. 454.) He testified that the Good Samaritan physicians sent him for an x-ray and told him that there was nothing wrong with him. (Tr. 453-54.) He said he stopped going because they "wouldn't prescribe anything for pain" and he "couldn't see driving 40 miles one way just to have them tell me there wasn't nothing wrong with me." (Tr. 454.) The Good Samaritan medical records indicate that he was prescribed Mobic[5] for back pain in October 5, 2007, but reported that it did not help. (Tr. 391.) He was then prescribed Salsalate[6] and what appears to be Baclofen,[7] for back pain on November 2, 2007. (Tr. 391.) He returned to the clinic on November 26, 2007 and reported no significant improvement. (Tr. 390.)

---

[5]Mobic is an NSAID inidcated for relief of signs and symptoms of osteoarthritis (OA) and rheumatoid arthritis (RA). http://www.pdr.net/drug-summary/mobic?druglabelid=1245&id=1610 (last accessed Dec. 27, 2013.)

[6]Salsalate is an NSAID indicated for relief of relief of signs/symptoms of rheumatoid arthritis, osteoarthritis, and related rheumatic disorders. http://www.pdr.net/drug-summary/salsalate?druglabelid=1649&id=326 )last accessed Dec. 27, 2013.)

[7]This notation was almost illegible. Baclofen is a GABA analog indicated for treatment of muscle spasticity associated with multiple sclerosis. May be effective in spinal cord injuries and other spinal cord diseases. http://www.pdr.net/drug-summary/baclofen?druglabelid=1058&id=1641 (last accessed Dec. 27, 2013.)

AO72A
(Rev. 8/82)

The plan notation indicated Prednisone[8] and a refill of the Baclofen. (Tr. 390.) There are no further records from Good Samaritan to show that he continued to work with the clinic.

Plaintiff testified that, prior to going to the Good Samaritan clinic, he had seen Dr. Bennett at the Scott County Rural Medical Clinic. (Tr. 453, 564.) He saw Dr. Bennett two times in December 2005, when Dr. Bennettt saw him for low back pain, scheduled him for an MRI, and saw him after the MRI. (Tr. 218-19.) Dr. Bennett gave him a limited prescription for Lorcet Plus,[9] for pain, and "explained to him that this is a short term treatment." (Tr. 218.) He noted that the Plaintiff was going to take a copy of his two progress notes and the MRI to his attorney "as he is applying for disability." (Tr. 218.) He noted that Plaintiff was going to "consider a follow up appointment in the next couple of weeks."(Tr. 218.) There are no further records from Dr. Bennett. Plaintiff testified that he stopped seeing Doctor Bennett in 2005 because he still owed him $50. (Tr. 453.) He did not testify that Dr. Bennett refused to see him.

Plaintiff's testimony indicates that he primarily uses a standard dose of over-the-counter pain medication. When questioned by his attorney, the Plaintiff agreed that at some point he had taken hydrocodone. (Tr. 452.) Dr. Bennett provided a short-term limited prescription of Lorcet Plus (acetaminophen with hydrocodone) for Plaintiff in 2005. (Tr. 218.) He was prescribed hydrocodone in 2011 by the St. Edward ER for his hand at the time of his lawn mower accident.

---

[8]Prednisone is an anti-inflammatory glucocorticoid indicated for steroid-responsive disorders.

[9]Lorcet is an opioid analgesic containing hydrocodone and acetaminophen. It is indicated for moderate to moderately severe pain. http://www.pdr.net/drug-summary/lorcet-plus?druglabelid=1478&id=1643 (last accessed Dec. 30, 2013.)

(Tr. 569.) He also testified that he had used some of his wife's leftover prescription Tylenol 3. (Tr. 452.) Otherwise he takes four acetaminophen per day.[10] (Tr. 453.)

As for medication side effects, the only prescription drug that the Plaintiff has taken regularly is Verapamil for his tachycardia. He did not complain of side effects at any point in the transcript.

The ALJ questioned the Plaintiff extensively at the hearing concerning his work running a brush hog (mower deck attached to a tractor) for the City of Huntington about two years prior to the hearing. Plaintiff testified that he worked about a month, four days a week, for six to eight hours a day. (Tr. 439-440.) Plaintiff did not testify that he needed to quit the job because of pain. Rather, he testified that the job ended because he finished it too quickly: "I guess I mowed too fast because I worked myself out of a job." (Tr. 439.) Plaintiff testified that the City subsequently hired someone else full-time to do the mowing rather than him because "they knew about his condition." (Tr. 440.) The ALJ expressly noted the brush hog work at least twice in his opinion. (Tr. 408, 411.)

There was substantial evidence for the ALJ to use in discounting Plaintiff's subjective allegations of pain.

V.    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decisions, and thus the decision should be affirmed. The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

---

[10]The recommended does of acetaminophen is 2 pills every 6 hours. http://www.tylenol.com/safety-dosing/usage/dosage-for-adults. (last accessed Dec. 27, 2013.)

AO72A
(Rev. 8/82)

DATED this 13th day of January, 2014.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

26